## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| HUNTER INNOVATIONS COMPANY, | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | | |
| v. | : | Case No. | 1:08-cv-00671 PLF |
| | : | Judge: | Paul L. Friedman |
| THE TRAVELERS INDEMNITY | : | Deck Type: | Contract |
| CO. OF CONN., *et al.* | : | | |
| | : | | |
| Defendants. | : | | |

### OPPOSITION TO MOTION TO DISMISS

Plaintiff, Hunter Innovations Company ("HIC"), by and through its attorneys, hereby opposes defendants' Motion to Dismiss, and states as follows:

1.      HIC as a sole proprietorship has standing to sue.

2.      None of the claims are barred by the applicable statute of limitations as all claims accrued, at the earliest, on April 18, 2005.

3.      Plaintiff has successfully pled a fraud claim.

4.      The equitable claims against Travelers should only be dismissed if the Court finds that an express contract exists between plaintiff and Travelers.

In further support, HIC attaches its Memorandum of Points & Authorities incorporated by reference herein as if fully set forth.

WHEREFORE, given the above good and valid reasons, HIC respectfully requests that the Court enter the proposed Order appended hereto denying defendants' Motion to Dismiss in its entirety and awarding HIC any other such relief as is deemed proper.

HUNTER INNOVATIONS COMPANY


__/s/ Geoffrey M. Bohn_____
Geoffrey M. Bohn (D.C. Bar # 463248)
Robert A. Battey (D.C. Bar #463978)
BOHN & KOURETAS, PLC
P.O. Box 17811
Arlington, VA 22216
(703) 599-7076
(703) 842-8089 (Fax)

Attorney for Hunter Innovations Company


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of August, 2008, a copy of the

foregoing and attached supporting Memorandum of Points & Authorities was

electronically filed with the Clerk of Court using the CM/ECF system, which will then

send a notification of such filing (NEF) to the following:

Robert L. Ferguson, Jr.
FERGUSON, SCHETELICH & BALLEW, P.A.
100 S. Charles Street, Suite 1401
Baltimore, MD 21201-2725


___/s/  Geoffrey M. Bohn_____
Geoffrey M. Bohn

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| HUNTER INNOVATIONS COMPANY, | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | | |
| v. | : | Case No. | 1:08-cv-00671 PLF |
| | : | Judge: | Paul L. Friedman |
| THE TRAVELERS INDEMNITY | : | Deck Type: | Contract |
| CO. OF CONN., *et al.* | : | | |
| | : | | |
| Defendants. | : | | |

## PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES
## IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS

Plaintiff, Hunter Innovations Company ("HIC"), by its attorneys, hereby submits this Memorandum of Points & Authorities in support of its Opposition to Motion to Dismiss, and says as follows:

**A.      Standard on motion to dismiss or, alternatively, summary judgment.**

A motion to dismiss pursuant to Rule 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "Given the Federal Rules simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). The court must construe the factual allegations in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of factual inferences that can be derived from the facts alleged. *Kowel v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Additionally, Rule 12(b)(6) states that "if . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Fed. R. Civ. P. 12(b)(6).* Regarding Rule 56, a court may dispose of a case on summary judgment before trial only where there is no genuine issue as to any material fact. *See Fed. R. Civ. P. 56(c).* The standard test for summary judgment is "whether a fair-minded jury could return a verdict for the [nonmovant] on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In evaluating the nonmoving parties' showing, the trial judge should consider the cumulative effect of the evidence, and to grant all reasonable inferences to the nonmoving party. *Catrett v. Johns-Manville Sales Corp.,* 826 F.2d 33, 39-40 (D.C. Cir. 1987); *Exxon Corp. v. FTC,* 663 F.2d 120, 126 (D.C. Cir. 1980). The trial court, then, may grant summary judgment only if there is no "significantly probative" evidence tending to support the complaint. *Anderson,* 477 U.S. at 249-50, 106 S.Ct. at 2510-11. To be significantly probative, evidence need only be sufficient to permit a reasonable juror, indulging all reasonable inferences, to find that the party proved the element at issue. *Shields v. Eli Lilly and Co.,* 895 F.2d 1463 (D.C. Cir. 1990).

Applying the applicable standard here, this Complaint should not be dismissed based upon the statute of limitations.

**B.      HIC as a sole proprietorship has standing to sue.**

2

In *Relcade v. ITT Hartford,* 254 Va. 501, 492 S.E.2d 453 (1997), on certifying a question from the District of Columbia Court of Appeals, the court held that a sole proprietorship is not a legal entity separate and distinct from the individual owner doing business in that name. The court stated that a sole proprietorship is:

> A form of business in which one person owns all the assets of the business in contrast to a partnership, trust or corporation. The sole proprietor is solely liable for all the debts of the business. *Black's Law Dictionary 1392 (6th ed. 1990).* Even when an individual does business as a sole proprietorship under a different name, the individual remains personally liable for all obligations of the business. *Carlson v. Doekson Gross, Inc.,* 372 N.W.2d 902, 905 (N.D. 1985). Doing business under another name does not create an entity distinct from the person operating the business. The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all obligations. *Id.*

*Relcade,* 492 S.E.2d at 437-38.

Despite the above, defendants argue that plaintiff's claim fail as a matter of law because it lacks standing to sue or be sued. *See Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Memo"), p. 12.* Citing *Pritchett v. Stillwell,* 604 A.2d 886 (D.C. 1992), defendants assert that the common law of the District of Columbia is that neither a partnership nor an unincorporated association may sue or be sued. *Memo, p. 12.* In *Pritchett,* the complaint asserted defendant was "A & A Snow Removal" and the amended complaint asserted defendant was "Lee Stillwell t/a A & A Snow Removal Co." The court reversed summary judgment based on the statute of limitations, finding that the plaintiff had not changed the party defendant in an amended pleading. The court reasoned that a sole proprietorship may litigate in its own name. The court explained, and similar to *Relcade, supra,* that:

> In a sole proprietorship, 'a single natural person makes all the decisions

3

> [and] is personally responsible for payment of all debts of the business and
> is entitled to all profits. . . . The sole proprietorship is identified with the
> owner to the extent that the business either ceases or undergoes a
> fundamental change when the owner dies or retires. . . .

*Id.,* quoting *A. Brombert & L. Ribstein, Bromberg and Ribstein on Partnership 1.01, at*

*1:2 (1991).* The court stated further that a sole proprietorship is neither a partnership nor

an unincorporated association, defining an unincorporated association as a:

> [C]ollection of persons united for collective purpose generally formed
> under common law right of contract; although not a partnership,
> association is rated as partnership so far as its capacity to be sued.

*Id.,* 604 A.2d at 889. The court concluded that defendant was only a sole owner and

operator of a proprietorship involving no contractual agreement or charter among

principals, and therefore there had been no change of any party in the amended

complaint. Thus, the sole proprietorship as initially defined had the capacity to be sued.

Given the above, here plaintiff has standing to sue as it is a sole proprietorship.

*See Affidavit of James F. Hunter attached hereto as Exhibit 1.* Contrary to defendants'

suggestion, a sole proprietorship does not need to be incorporated to litigate in its own

name. In the District of Columbia, a sole proprietorship is neither a partnership nor an

unincorporated association. *See Pritchett, supra.* Therefore, defendants' assertion that

plaintiff lacks standing to litigate because it is an "unincorporated entity" should be

rejected as contrary to applicable law.

**C.    None of the claims are barred by the applicable statute of limitations as all
claims accrued, at the earliest, on April 18, 2005.**

4

    **i.**       **The subject contract was not breached until, at the earliest, April 18, 2005.**

For a contract to be enforceable, "there must be (1) an agreement to all material terms, and (2) intention of the parties to be bound." *Duffy v. Duffy,* 881 A.2d 630, 634 (D.C. 2005). In addition, mutuality of obligation must exist. *Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 125 (D.C. 1976). "A contract must be sufficiently definite as to its material terms (which include, e.g., subject matter, price, payment terms, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonable certain." *Rosenthal v. National Produce Co.,* 573 A.2d 365, 370 (D.C. 1990). However, "[a]ll the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to [be enforceable]." *Id.* "All agreements have some degree of indefiniteness and some degree of uncertainty." *Id.* A contract is enforceable if it is "sufficiently definite so that the parties can be reasonably certain as to how they are to perform." *Duffy,* 881 A.2d at 638. Moreover, "the terms of the contract [must be] clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy. . . ." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.,* 774 A.2d 320, 327 (D.C. 2001). "A cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach. . . ." *Eastbanc v. Georgetown Park Associates,* 940 A.2d 996, 1004 (D.C. 2008). A contract is breached if a party fails to perform when performance is due. *Id.*

    Given this authority, here the subject written contract stated, *inter alia,* that:

    We have agreed to approach this loss on a time and material basis. You will be able to document your project costs through time and material to me for justification of the claim. We will then pay 10% profit and 15%

overhead on your total time and material costs.

*Contract, dated December 12, 2003, attached hereto as Exhibit 2.*

Subsequently, on December 14, 2004, defendant Brady acknowledged receipt of

the plaintiff's December 2004 Final Statement, but stated that "the last complete update

in writing we received from you was on 2/23/04. . . ." *Letter from defendant Brady,*

*dated November 14, 2004, attached hereto as Exhibit 3, p. 1.* In this letter, defendant

Brady stated further that:

> Now at this time we will need to complete further investigation and
> documentation in order to substantiate the total billing that you have
> submitted. In order to do this we will be engaging a construction
> consultant, Mr. Michael Shilling with Meyers Construction to assist us. In
> order to complete our investigation we will be looking from you and our
> insured:
>
> 1. Copies of all plans and specifications used to complete
>    repairs
> 2. Copies of all engineering work completed
> 3. Access to the premises for our construction consultant
>
> These items would be needed as soon as possible in order for us to begin
> the process. . . .
>
> Once we have received all project related plans, specifications and
> engineering work performed we will be arranging a meeting onsite with
> our construction consultant to begin the process.

*Id., pp. 1-2.* On February 1, 2005, Mr. James F. Hunter, the sole owner of plaintiff, met

with defendants' construction consultant at the subject premises. *See Exhibits 1 and 4*

*attached hereto.* On March 22, 2005, defendants' construction consultant provided his

report to defendant Brady. *See Exhibit 5 attached hereto.* Then, approximately one

month later, on April 18, 2005, based upon the March 22, 2005 report, defendant Brady

wrote the subject premises owner and advised, *inter alia,* that:

6

At this time we are processing settlement of this claim based on Meyer's Construction Co., Inc.'s estimate which has been included for your review. . . . Should we receive any further documentation from Hunter Innovations we will take it under consideration at that time.

The total replacement cost of damages as set forth by Meyers Construction Co., Inc. is $210,214.21. We have applied your policy deductible of $1,000.00 to that amount. Please also recall that there have been three advances issued during the course of repairs that total $95,000.00. At this time a check in the amount of $114,214.21 has been issued and will arrive under separate cover.

*Letter from defendant Brady, dated April 18, 2005, attached hereto as Exhibit 6.*

Defendant Brady's referenced April 18, 2005 letter reflects that plaintiff was copied, however the copy address stated it was sent to "Alexandria, Virginia" as opposed to "Arlington, Virginia," where defendants had sent all prior communications to plaintiff. *Id.; see also Exhibit 1.* Due to the incorrect mailing address, plaintiff did not learn about defendant Brady's April 18, 2005 letter until months later. *See Complaint, ¶ 13, and Exhibit 1.*

Considering the circumstances, the contract required plaintiff to provide defendants documentation related to plaintiff's costs through time and material. *See Exhibit 2.* The contract then required defendants to pay 10% profit and 15% overhead on plaintiff's total time and material. *Id.* On December 14, 2004, defendants advised plaintiff in writing that defendants had not received the requisite documentation to make payment. On April 18, 2005, defendant Brady advised further that plaintiff was being given an opportunity to provide back-up documentation. However, April 18, 2005 was the **first instance** that defendants indicated plaintiff would not be paid profit and overhead as stated in the contract based upon plaintiff's time and material. Therefore,

April 18, 2005, at the earliest, is when plaintiff's breached the subject contract.  Before

then, defendants had repeatedly represented to plaintiff that plaintiff would be paid in full

in accordance with the terms of the contract.  *See Complaint, ¶¶ 9, 13 and Exhibit 1.*

Accordingly, since plaintiff filed its Complaint on April 17, 2008, within three (3) years

of the date of defendant Brady's April 18, 2008 letter, plaintiff's claims are not time-

barred.  Put simply, viewing all factual inferences as described in plaintiff's favor, the

Complaint should not be dismissed based on the statute of limitations

> ii.    **Alternatively, plaintiff's claims are timely under the discovery rule.**

District of Columbia law applies the "discovery rule" to determine when an action

accrues, absent equitable tolling.  *Ezra Co. v. Psychiatric Institute of D.C.,* 687 A.2d 587

(D.C. 1996).   "Under this rule, a cause of action accrues when the plaintiff has

knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1)

the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing."

*Goldman v. Bequai,* 19 F.3d 666, 671-72 (D.C. Cir. 1994), quoting, *Knight v. Furlow,*

553 A.2d 1232. 1234 (D.C. 1989).  The standard governing a plaintiff's duty relating to

its potential causes of action is as follows:

> In every case, the plaintiff has a duty to investigate matters affecting her
> [or its or his] affairs with reasonable diligence under all circumstances.
> Once the plaintiff actually knows, or with the exercise of reasonable
> diligence would have known, of some injury, its cause-in-fact, and some
> evidence of wrongdoing, then she [or it or he] is bound to file her [or its or
> his] cause of action within the applicable limitations period, measured
> from the date of her [or its or his] acquisition of the actual or imputed
> knowledge.

*Ezra Co.,* 687 A.2d at 592, quoting *Diamond v. Davis,* 671 A.2d 905, 922 (D.C. 1996).

"What constitutes the accrual of a cause of action is a question of law [but] [w]hen

accrual actually occurred in a particular case is a question of fact."   *Ezra Co.,* 687 A.2d at 592, quoting *Diamond,* 671 A.2d at 911.  Moreover, "[i]n all cases to which the discovery rule applies the inquiry is highly fact-bound and requires an evaluation of all the plaintiff's circumstances." *Ezra Co.,* 687 A.2d at 592, quoting *Diamond,* 671 A.2d at 913.  Consequently, under District of Columbia law, "[s]ummary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of [his] injury." *Goldman,* 19 F.3f at 672, quoting *Byers v. Burleson,* 713 F.2d 856, 861 (D.C. Cir. 1983).

Regarding alleged misrepresentation and discovery, the law of misrepresentation provides that a fact-finder must take into account a plaintiff's specific situation, and whether it was reasonable for someone in the plaintiff's circumstances to have failed to discover the alleged injury within the limitations period.  *See Goldman,* 19 F.3d at 673-74.  Under District of Columbia law, a plaintiff must show that he in fact relied upon an alleged misrepresentation.  *Goldman,* 19 F.3d at 674, citing *King v. Industrial Bank of Washington,* 474 A.2d 151, 155-56 (D.C. 1984).  Reliance in arms-length commercial transactions must be reasonable.  *Goldman,* 19 F.3d at 674, citing *Hercules & Co. Ltd. v. Shama Restaurant Co.,* 613 A.2d 916, 933-34 n. 25 (D.C. 1992).

Applying these principles, in *Ezra Co., supra,* based upon the discovery rule, the court reversed summary judgment on the applicable statute of limitations, finding there were genuine issues of material fact that precluded summary judgment.  This reasoning is apposite here as plaintiff has asserted that there was no knowledge of the breach until

9

June 2005, when it was discovered, well within three (3) years of filing the Complaint.

Plaintiff also has presented specific facts to show that reliance on defendants'

representations was reasonable. *See Exhibit 1.* Given the "highly-fact bound" inquiry as

to notice of accrual for a cause of action, and the assertions made here, dismissal at this

time is premature.

### iii.    Alternatively, plaintiff's claims are timely under the equitable estoppel and equitable tolling doctrines.

In litigation between private parties, courts have long invoked waiver, estoppel,

and equitable tolling to ameliorate the inequities that can arise from strict application of a

statute of limitations. *Chung v. U.S. Dept. of Justice,* 333 F.3d 273, 275-76 (D.C. Cir.

2003), citing *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453,

457, 112 L.Ed.2d 435 (1990). Both equitable estoppel and equitable tolling operate, in a

practical sense, to toll a limitations period. *Currier v. Radio Fee Europe/Radio Liberty,*

*Inc.,* 159 F.3d 1363, 1367 (D.C. Cir. 1999).

> Whereas equitable tolling allows a plaintiff to avoid the bar of the
> limitations period if despite all due diligence he is unable to obtain vital
> information bearing on the existence of his claim, equitable estoppel in the
> statute of limitations context prevents a defendant from asserting
> untimeliness where the defendant has taken active steps to prevent the
> plaintiff from litigating in time.

*Id.,* citing *Smith-Haynie v. District of Columbia,* 155 F.3d 575, 579-80 (D.C. Cir. 1998).

The two doctrines, although functionally similar, "have distinct criteria" – equitable

estoppel revolving around the conduct of the defendant and equitable tolling around the

circumstances of the plaintiff. *See Chung,* 333 F.3d at 278-79. There is a difference in

effect as well:

10

> Equitable estoppel takes the statute of limitations out of play for as long as is necessary to prevent the defendant from benefiting from his misconduct, whilst equitable tolling . . . merely ensures that the plaintiff is not, by dint of circumstances beyond his control, deprived of a "reasonable time" in which to file suit.

*Chung,* 333 F.3d at 279, citing *Phillips v. Heine,* 984 F.2d 489, 492 (D.C. Cir. 1993).

Therefore, a defendant is estopped from raising the statute of limitations as a defense if that defendant has "done anything that would tend to lull the plaintiff into inaction and thereby permit the statutory limitation to run against him." *Property 10-F, Inc. v. Pack & Process, Inc.,* 265 A.2d 290, 291 (D.C. 1970); *Goldman,* 19 F.3f at 673, quoting *Interdonato v. Interdonato,* 521 A.2d 1124, 1133 (D.C. 1987). In *Chung, supra,* the court reversed dismissal of the plaintiff's complaint for violation of the Privacy Act, 5 U.S.C. § 552a(b), on the basis of equitable tolling. Similarly, in *Currier, supra,* based upon the equitable estoppel doctrine, and the defendant's affirmatively misleading statements that a grievance would be resolved in the plaintiff's favor, the court reversed summary judgment dismissing an employment retaliation claim.

Additionally, in *Goldman, supra,* the court reversed summary judgment, finding the record made it clear that appellant had alleged facts which, if proven at trial, court serve to equitably toll the statute of limitations under several different theories. The court applied *de novo* review, and stated that the evidence offered by the nonmoving party must be accepted as correct, and all justifiable inferences must be drawn in the nonmoving party's favor. In short, to avoid summary judgment, the plaintiff must show the existence of evidence sufficient to permit a reasonable jury to find that the statute of limitations should have been equitably tolled. As a general matter, "what a plaintiff

11

knew and when he knew it, in the context of a statute of limitations defense are questions of fact for the jury." *Goldman,* 19 F.3d at 672, quoting *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1484 (D.C. Cir. 1989).

Further, the court stated that "no man may take advantage of his own wrong" and to note that this principle may be "employed to bar inequitable reliance on statute of limitations." *Goldman,* 19 F.3f at 673, quoting *Interdonato,* 521 A.2d at 1135. The court noted that whether the defendant made the alleged promises, and whether the plaintiffs were lulled by these promises into not bringing suit, the presence of these issues precluded the granting of summary judgment based on the statement of limitations. The court finally advised, citing *Kropinski v. World Plan Executive Council,* 853 F.2d 948, 955-56 (D.C. Cir. 1988), that it was for a jury to decide when a plaintiff who alleged that he had been lulled into not bringing suit should have discovered the defendants' alleged fraud.

*Goldman* applies here as plaintiff has asserted specific facts to show that defendants' misconduct lulled plaintiff into inaction until June 2005. Accordingly, given the asserted facts, the equitable doctrines should toll the statute of limitations until that date. Thus, based upon the record, all claims should be considered timely filed.

        iv.      **Defendants' authority is distinguishable from the present circumstances and, therefore, should be disregarded.**

Defendants argue that the statute of limitations would have run in September 7, 2007, when plaintiff first provided its Final Statement to defendants. *See Memo, pp. 3-4.*

As support, defendants cite and primarily rely upon *Bembery v. District of Columbia,* 758 A.2d 518 (D.C. 2000).  In *Bembery,* at issue was charges under the lease of two townhouses for the tenant's overtime use of the buildings.  There, the landlord submitted overtime charges to the tenant as follows:  in December 1992 for the period July through November 1992; in April 1993 for the period December 1992 through March 1993; and monthly thereafter for the remaineder of the lease (ending December 1994).  The landlord heard nothing from the tenant about these charges until it received a letter dated March 30, 1994, stating that the tenant was denying payment for the overtime charges.

The trial court concluded that the landlord's cause of action for breach began to run on the date the tenant received the successive bills for overtime usage.  Accordingly, it dismissed the claim for any charges submitted more than three years before the date of her suit.  In affirming, the court noted that the parties agreed that in an action for breach of contract or lease the statute of limitations runs from the time of the breach.  *Id.,* citing *Management Partnership, Inc. v. Crumlin,* 423 A.2d 939, 942 (D.C. 1980).  The court explained further that a breach is "an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages."  *Bembery,* 758 A.2d at 520, quoting *Fowler v. A&A Co.,* 262 A.2d 344, 347 (D.C. 1970).  Given the facts, the court concluded that the charge per hour for additional or overtime usage was fixed by contract, and the hours of usage could readily be ascertained by the tenant from its records.  Moreover, the landlord's argument that it had no reason to assume a refusal to pay until she received the tenant's letter – fully fifteen months after she made the original demand – was untenable.  The court found that no provision of the lease prevented the

landlord from pursuing the right to sue once they had made successive demands and received no payment from the tenant.

However, *Bembery* is inapposite to the present circumstances. *Bembery* held the cause of action for breach began to run on the date the tenant received the *successive* bills. In contrast, defendants attempt to assert that the statute runs here from the date of the plaintiff's *initial* Final Statement, September 2004. In any event, *Bembery* is factually dissimilar to the present case and should have no bearing. Unlike the tenant in *Bembery,* here there has been no allegation that defendants *received* successive Final Statement billings from the plaintiff. *See Complaint.* Contrary to *Bembery,* here the subject Complaint merely states that "In September 2004, and again in December 2004, HIC provided a written Final Statement to Brady and Travelers, which reflected total job costs." *Id., ¶ 11.* There is no allegation that defendants *received* both Final Statements. *Id.*

The facts also reflect to the contrary. *See Exhibit 3.* In his December 14, 2004 letter, defendant Brady acknowledged receipt of the December 2004 Final Statement, but stated that "the last complete update in writing we received from you was on 2/23/04. . . ." *Id.* Defendant Brady's referenced letter, unlike the tenant in *Bembery,* never stated that defendants would not pay pursuant to plaintiff's Final Statement. Moreover, there is no admission or representation that defendants received the September 2004 Final Statement. *Id.* In this regard, defendant Brady, as shown above, requested documentation from plaintiff, which supported plaintiff's Final Statement. *Id.* Clearly, defendant Brady's December 14, 2004 letter should not be perceived as an

14

unjustified failure to pay plaintiff, which would cause the breach, as defendants have not stated they would not pay plaintiff. *See Fowler, supra.* Furthermore, pursuant to the subject contract, defendants owed no performance to pay plaintiff profit and overhead on time and material costs until they had received the requisite documentation. *See Exhibit 2.* Thus, given the facts shown, on December 14, 2004, there could be no breach of contract. *See Eastbanc, supra.*

In any event, subsequently, on February 1, 2005, Mr. James F. Hunter, the sole owner of plaintiff, met with defendants' construction consultant at the subject premises as defendants requested. *See Exhibits 1 and 3 attached hereto.* On April 18, 2005, based upon this inspection of the subject premises, and defendants' construction consultant report dated March 22, 2005, defendant Brady advised the subject premises owner that "[A]t this time we are processing settlement of this claim based on Meyer's Construction Co., Inc.'s estimate which has been included for your review." *Exhibits 5 and 6.* The referenced April 18, 2005 letter reflects that plaintiff was provided a copy, however the copy address stated it was sent to "Alexandria" as opposed to "Arlington" where all previous defendant communications to plaintiff had been sent. *See Exhibits 1 and 6.* Notwithstanding, as stated, the April 18, 2005 letter from defendants Brady was the first statement from defendants that they would not perform all or any part of the contract to pay plaintiff according to plaintiff's Final Statement.

Additionally, and as alleged, between December 14, 2004 and April 18, 2005, and even though in possession of the March 22, 2005 construction consultant report, defendants repeatedly represented to plaintiff that it would be paid in full in accordance

with the terms of the agreed-upon written contract. *See Complaint, ¶ 9.* Thus, the present matter is not comparable to a landlord-tenant dispute where the landlord has sent monthly billings to the tenant. Moreover, this is not a situation where the party acknowledged receiving successive billings demanding payment. Further, this is not a situation where the party immediately advised it would not perform any part of what was promised upon receiving the other party's *only* final billings. Before the date of breach, this also is not a situation where the party owing performance remained silent, but instead knowing that performance would not be performed, still represented to the other party that there would be performance. Defendants' denial to plaintiff's demand also did not occur fifteen months later. Considering these critical factual distinctions, *Bembery* does not apply in this matter.

Defendants also argue, citing *Handel v. World Plan Exec. Council,* 705 A.2d 656, 661 (D.C. 1997), that there were disputes regarding cost advances that plaintiff should have discovered that it had a cause of action for breach of contract in December 2004. *See Memo, p. 6.* However, here regarding cost advances, the subject contract merely stated that "we have advance [*sic*] $15,000 to the insured in order to get the project going." *Exhibit 2.* Additionally, there is <u>no</u> allegation in the Complaint that defendants' failed to advance costs in accordance with the terms of the subject contract. *See Complaint.* Thus, failure to advance costs cannot give rise to any breach of the subject contract. *Handel* also has no bearing on this case as here we are not concerned with transcendental meditation. Unlike *Handel,* here there have been no allegations that if plaintiff did not go to bed by 10 o'clock it would be responsible for World War III, or

16

that plaintiff alleged defendants stated they would slowly rise in the air, fly over lakes, walk through walls and become invisible. *See Handel, supra.* Stated differently, unlike *Handel,* here defendants did not impart sufficient facts to put plaintiff on notice of any harm until defendant Brady authored his April 18, 2005 letter as shown.

Defendants also assert, citing *Bradley v. National Ass'n or Securities Dealers Dispute Resolution, Inc.,* 245 F.Supp.2d 17, 23 (D.D.C. 2003), that plaintiff's claims for unjust enrichment, quantum meruit, and fraud are "completely dependent upon and intertwined" with the breach of contract claim, and therefore these claims are also time-barred. *See Memo, pp. 6-7.* In *Bradley,* the court ruled that plaintiff's fraud, abuse of process, and intentional infliction of emotional distress claims were entirely predicated on events that plaintiff alleged in her claim for professional negligence. However, *Bradley* is not relevant here as the fraud and equitable claims were not entirely predicated on the breach of contract claim. *See Complaint, ¶¶ 15 – 17.* In any event, as the evidence shows that plaintiff's breach of contract claim should not be time-barred, even assuming *arguendo* the other claims are completely dependent and intertwined, the other claims also are not untimely.

**D.    Plaintiff has successfully pled a fraud claim.**

Defendants' argue, quoting *Wagshal v. Rigler,* 947 F.Supp. 10, 14 (D.D.C. 1996), that a subsequent breach of contract does not give rise to a claim of fraud unless fraudulent intent existed at the time of the contract. *See Memo, p. 8.* Notwithstanding this limitation, citing *Regency Communications, Inc. v. Cleartel Communications, Inc.,* 160 F.Supp.2d 36 (D.D.C. 2001), defendants acknowledge that circumstances do exist

17

"when a Plaintiff has a colorable fraud claim related to a breach of contract claim."

*Memo, p. 8.*

The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation. *Atraqchi v. GUMC Unified Billing Servs.,* 788 A.2d 559, 563 (D.C. 2002), quoting *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C. 1977). Here, each of these elements was specifically alleged in the Complaint. *See Complaint, ¶¶ 29 – 33.*

Moreover, in *Virginia Academy v. Group Hospitalization,* 878 A.2d 1226, 1234 (D.C. 2005)*,* the District of Columbia Court of Appeals held that the breach of a contractual promise can be the subject of the tort of fraudulent misrepresentation. There, on the given facts, the court affirmed summary judgment dismissing a common law fraud claim. However, the court nonetheless stated that:

> A promise or contractual commitment may be actionable as fraud (misrepresentation) if at the time of its making, the promisor had no present intention of carrying it out.

*Id.,* citing *Bennett,* 377 A.2d at 60-61. The court stated further that:

> A promissory representation, or a representation as to future events asserted in a common law fraud action, should only be considered a misrepresentation of fact *where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur.* When a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud.

*Virginia Academy,* 878 A.2d at 1234, quoting *Bennett,* 377 A.2d at 60-61 (emphasis added). Further, the breach of a promise may be enough in itself to establish the

fraudulent intent and may be inferred from the circumstances, "such as the defendant's . . . reason to know that he cannot pay, or his repudiation of the promise soon after it is made, with no intervening change in the situation, or his failure even to attempt, or his continued assurances after it is clear that he will not do so." *Virginia Academy,* 878 A.2d at 1234-35, quoting *Prosser & Keaton on Torts § 109,* at 764-65 (5th ed. 1984).

Considering *Virginia Academy,* here plaintiff alleged that a promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur. *See Complaint, ¶ 9.* Additionally, plaintiff has provided evidence supporting these misrepresentations of fact. *See Exhibit 1.* During performance of the contract, defendants repeatedly represented that plaintiff would be paid in full in accordance with the express contract. *Id.* After performance, and even though possessing a report which would be the basis for breaching the contract, defendants continued to represent to plaintiff that plaintiff would be paid in full. However, these representations were knowingly false and give rise to a fraud claim independent of any mere breach of contract. Therefore, construing the facts and evidence in a light most favorable to plaintiff, the fraud claim should not be dismissed at this time.

**E.      The equitable claims against Travelers should only be dismissed if the Court finds that an express contract exists between plaintiff and Travelers.**

It is not disputed that there is no need to resort to quasi-contract "when the *evidence* sustains the existence of a true contract, either express or implied in fact." *Bloomgarden v. Coyer,* 479 F.2d 201, 210 (D.C. Cir. 1973) (emphasis added). Similarly, in *Schiff v. American Ass'n of Ret. Persons,* 697 A.2d 1193 (D.C. 1997), the court

affirmed the trial judge had correctly ruled that the existence of express contracts between the parties can be determined from the allegations in the complaint, and therefore no claim for unjust enrichment could lie.

Given this authority, defendants argue that plaintiff's equitable claims are barred by its allegations of an express contract. *See Memo, p. 7.* However, the defendants also have argued baldly that plaintiff's Complaint fails to state a cause of action upon which relief may be granted. *See Motion to Dismiss, ¶ 1.* Therefore, considering defendants' argument, if the Court finds that no existence of an express contract between plaintiff and Travelers can be determined from the allegations of the Complaint and related evidence, then the equitable claims should not be dismissed. However, under *Schiff,* if the Court finds that the existence of such an express contract can be so determined, then the equitable claims against Travelers should be dismissed.

## CONCLUSION

For the reasons states above, this Court should enter an Order denying defendants' Motion to Dismiss. Plaintiff has capacity to sue or be sued. Plaintiff's claims are not barred by the applicable statute of limitations. Plaintiff's fraud claim has been sufficiently pled.

HUNTER INNOVATIONS COMPANY


    /s/ Geoffrey M. Bohn
Geoffrey M. Bohn (D.C. Bar # 463248)
Robert A. Battey (D.C. Bar #463978)
BOHN & KOURETAS, PLC
P.O. Box 17811
Arlington, VA 22216

20

(703) 599-7076
(703) 842-8089 (Fax)

Attorney for Hunter Innovations Company

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

HUNTER INNOVATIONS COMPANY,          :
                                     :
   Plaintiff,         :
                                     :
v.                                   :  Case No.  1:08-cv-00671 PLF
                                     :  Judge:   Paul L. Friedman
THE TRAVELERS INDEMNITY              :  Deck Type: Contract
CO. OF CONN., *et al.*               :
                                     :
   Defendants.         :

### AFFIDAVIT OF JAMES F. HUNTER

James F. Hunter, being duly sworn on oath does depose and say as follows:

1.  I am over the age of 18, and competent to testify.

2.  I am making this affidavit based on personal knowledge.

3.  Hunter Innovations Company ("HIC") is a sole proprietorship.  HIC is

neither a partnership nor an unincorporated association.   As a sole proprietorship, I make

all the decisions, I am personally responsible for all debts of the business, and I am

entitled to all profits for HIC.  HIC ceases as a business when I retire or die.  I do not have

any partners related to HIC, and HIC is not owned or operated by a collection of persons

united for collective purpose pursuant to a contract.  HIC has no contractual agreement or

charter among principals.  I am aware of no requirement that requires a sole

proprietorship to register as a corporation in the Commonwealth of Virginia or in any

other jurisdiction of the United States.

2.  From December 12, 2003, until approximately a week to ten (10) days

before June 22, 2005, when The Travelers Indemnity Company of Connecticut, The

EXHIBIT

1

Travelers Group and/or St. Paul Travelers ("Travelers") issued a supposed "final check," I did not know that Travelers would not pay HIC pursuant to the express terms of the December 12, 2003 contract.

3.     The first time I was made aware that Stephen Brady ("Brady") and Travelers would not make payment to HIC pursuant to the terms of the express contract was, as stated, 7 – 10 days before June 22, 2005, when Brady sent me a copy of his April 18, 2005 letter. I first learned of the existence of the April 18, 2005 letter in June 2005, when Brady informed me after he finally responded to one of my many numerous telephone calls. At that time, I requested a copy of this April 18, 2005 letter, which Brady sent.

4.     During the time period referenced in Paragraph 2, Brady repeatedly represented to me that "we're a responsible company, you're going to be paid." However, these representations were made to induce HIC to enter into contract with Travelers. Neither Travelers nor Brady ever had any intention to pay HIC pursuant to the terms of the express contract as the subsequent facts clearly showed.

5.     Travelers and Brady repeatedly represented to me that HIC would be paid in full pursuant to the terms of the express contract. However, these representations were knowingly false when made, and were only made so that HIC would complete performance pursuant to the express contact.

6.     Shortly after December 14, 2004, I received Brady's December 14, 2004 letter, which stated that final payment to HIC could not be issued until additional documentation had been produced by me, and which requested that I meet with Mr.

2

Michael Shilling ("Shilling") of Meyers Construction Co., Inc. ("Meyers Construction") at the subject property, 1916 18th Street, NW, Washington, DC, to show him the materials that had been used by HIC in completing performance.

7.    On or about January 27, 2005, Shilling sent me a facsimile, which I received, requesting that I meet him at the subject property on February 1, 2005.

8.    On February 1, 2005, I met Shilling at the subject property. The meeting lasted approximately only 10-12 minutes. I showed Shilling some of the materials HIC used in completing performance. I was advised by Shilling that he had been retained as a consultant for Travelers and that he sometimes did work for Travelers.

9.    However, on February 1, 2005, I was not advised by Shilling that he or Meyers Constructions was preparing a report, which would affect HIC's final payment from Brady and Travelers pursuant to the express contract.

10.    Between February 1, 2005, and June 2005, when I finally received Brady's April 18, 2005 letter, I repeatedly called Brady about the status of final payment to HIC. Brady either failed to respond to my calls or when he did respond assured me that final payment would be issued pursuant to the contract.

11.    At no time until shortly before Travelers issued its supposed "final check" on June 22, 2005, was I made aware that Meyers Construction had prepared any report for Brady and Travelers. The first time I saw Meyers Construction's March 22, 2005 report was when it was enclosed with Brady's April 18, 2005 letter, which I received, as stated, shortly before June 22, 2005.

12.    In all my conversations with Brady after February 1, 2005, at no time did

3

Brady represent to me that the "final check" to HIC would be dependent upon the findings of Shillings or Meyers Construction. To the contrary, as stated, Brady always represented to me that HIC would be paid in full according to the terms of the contract. Brady repeatedly told me "we're a responsible company, you're going to be paid."

13.     My reliance on Brady's repeated representations was reasonable given the amount of advance payments HIC had received pursuant to the express contract (nearly $100,000.00), my experience in refurbishing historical real properties, and given that I had no prior knowledge that Brady or Travelers had attempted to defraud, cheat or breach contracts with persons similarly situated as myself.

14.     Brady's April 18, 2005 letter was copied to me and sent to an incorrect address in Alexandria, Virginia. Prior to this April 18, 2005 letter, Brady had always sent letters to me at HIC's correct address in Arlington, Virginia. For reasons unknown to me, Brady's April 18, 2005 letter was not forwarded to me from Alexandria, Virginia.

15.     Based upon repeated telephone calls to Brady regarding the status of final payment to HIC, I became aware of Brady's April 18, 2005 letter, which Brady sent to me pursuant to my request over the telephone, and which I received, as stated, in June 2005, shortly before Travelers issued its supposed "final check."

16.     I did not discover that Brady and Travelers would not pay HIC according the express terms of the December 12, 2003 contract until 7 – 10 days before June 22, 2005.

17.     I was extremely diligent in trying to obtain information related to HIC's final payment as described. However, on many, many occasions Brady did not respond to

4

my telephone calls or when he did Brady reassured that payment would issue according to the express contract.

18.     Even after receipt of Travelers' supposed "final check," Brady advised me that if I could provide additional information or documentation to him or Shilling, it would be taken under consideration at that time. In July 2005, I contacted Shilling about his report, but he was not responsive to discussion about items of his March 22, 2005 report. Additionally, my attempts at this time to have Brady and Travelers reconsider their position failed.

I HEREBY AFFIRM that I have made the foregoing affidavit based on my personal knowledge and that the matters stated therein are true.

_____
JAMES F. HUNTER

COMMONWEALTH/STATE OF _____:

Subscribed and sworn to before me this 4th day of August, 2008, by a Notary Public in and for the Commonwealth/State of Virginia.

_____
Notary Public

My Commission Expires on: April 30 2011
Notary Registry Number 330104

5



410-529-6623
877-389-4685 fax
Stephan.Brady@Travelers.com

P.O. Box 17158
Baltimore, MD 21297-1158

# Fax Cover Sheet

**Date:**          **December 12, 2003**

**To:**             **James Hunter**

**Company:**    **Hunter Innovations Company**

**Fax #:**          **703-241-5709**

**From:**           **Stephen Brady**

**Re:**              **Claim #:      AMY4317**
                        **Insured:     Mary V. White**
                        **Policy #:**
                        **DOL:**

**Total # of Pages:**          **1**

**Message:**

In follow-up to our recent telephone conversation regarding the above mentioned repairs, thank you very much for your time and cooperation. We have agreed to approach this loss on a time and material basis. You will be able to document your project costs through time and material to me for justification of the claim. We will then pay 10% profit and 15% overhead on your total time and material costs.

At this time, we have advance $15,000 to the insured in order to get the project going. Should at anytime you need additional funds during the course of the project, please contact me.

Again, thank you very much for your time. The insured is very pleased that you will be the contractor doing the repairs and is anxious to get the repairs started.

EXHIBIT

2

Blumberg No. 5208

 **ST PAUL TRAVELERS**

**Stephen Brady, PCLS, FCLS**

*Technical Specialist*
*Property Claim Services*

410-529-5823
877-389-4685 fax
Stephen.Brady@Travelers.com

P.O. Box 17158
Baltimore, MD 21297-1158

December 14, 2004

Hunter Innovations Company
3310 North Vernon Street
Arlington, VA 22207-4468
Attn: Mr. Jim Hunter

RE:   Insured:                  Mary V. White
      Date of Loss:             8/17/2003
      Claim #:                  AMY4317
      Underwriting Co:          The Travelers Indemnity Company of Connecticut
      Policy Number:            432J0290

Dear Mr. Hunter:

We are in receipt of the recent documentation that you have submitted regarding repairs totaling $398,193.88 in regard to the above mentioned claim. Please recall that the last complete update in writing we received from you was on 2/23/2004 when the job expenditures were at $78,776.14 and were expected to reach an additional $29,000.00 for carpentry and masonry. On 3/7/2004 we were notified that the total expenditures had reached $102,470.82. From March until December we had been requesting the documentation from you and did not received anything from you until 12/7/2004 when you submitted the final billing in the amount of $398,193.88.

Now at this time we will need to complete further investigation and documentation in order to substantiate the total billing that you have submitted. In order to do this we will be engaging a construction consultant, Mr. Michael Shilling with Meyers Construction to assist us. In order to complete our investigation we will be looking for the following from you and our insured:

1.   Copies of all plans and specifications used to complete repairs
2.   Copies of all engineering work completed
3.   Access to the premises for our construction consultant

These items would be needed as soon as possible in order for us to begin the process. The following items we will need to complete the process:

EXHIBIT
**3**

Mary V. White # AMY4317
Page 2

4.    Information for all employees including, names, addresses, social security numbers, telephone numbers for employees who worked on project for:
      a.  Jenkins Carpentry, Co.
      b.  BCA Masonry
5.    List of daily activity (what work was being performed daily) including names of employees onsite from:
6.    a.  Jenkins Carpentry, Co.
      b.  BCA Masonry
      c.  Critical Path or Bar Chart of the project
7.    Copies of front and back of all project related checks

Once we have received all project related plans, specifications and engineering work performed we will be arranging a meeting onsite with our construction consultant to begin the process.

Please contact the undersigned with any questions that you might have.

Sincerely,

Stephen Brady, PCLS, FCLS
Property Technical Specialist

CC:    Mary V. White
       22 Nicholson Street, NW
       Washington D.C. 20011

# MEYERS CONSTRUCTION CO. INC.

## FIRE APPRAISERS • GENERAL CONTRACTORS

(410) 484-7474
fax (410) 484-3459

1121 greenwood road
suite 101
pikesville, maryland 21208

### TELECOPIER COVER LETTER

DATE ___1·27·05___

TIME ___12²⁰ pm___

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME & COMPANY ___James Hunter___

FAX NUMBER ___703·241·5709___

FROM:

NAME ___Mike Shilling___

WE ARE TRANSMITTING ___1___ PAGES (INCLUDING COVER)

COMMENTS: ___Re: 1916 18th N.W.___
___Washington DC___

Mr. Hunter —

Just a note to confirm our

Appointment for Tues. Feb 1, 2005

@ 11am at 1916 18th St.

Please make Arrangements for

access to the property

Mike Shilling

Cell # 410·977·4431

EXHIBIT
4

TOTAL P.01

# MEYERS CONSTRUCTION CO. INC.

### FIRE APPRAISERS • GENERAL CONTRACTORS

(410) 484-7474
fax (410) 484-3459

1121 greenwood road
suite 101
pikesville, maryland 21208

March 22, 2005

St. Paul Travelers Insurance
8013 Corporate Drive
White Marsh, Md. 21236

Attention: Mr. Steve Brady

Re: Mary V. White
1916 18th St., N.W.
Washington, D.C.

Dear Mr. Brady:

Please find below estimate covering replacement of lightning damages at the above captioned property.

| | | |
|---|---|---:|
| 1. | Demolition | $ 4,720.00 |
| 2. | Lumber, Millwork & Windows | 14,473.36 |
| 3. | Carpentry | 8,496.00 |
| 4. | Cleaning & Wall Preparation | 1,000.00 |
| 5. | Plaster/Drywall | 2,675.25 |
| 6. | Decorating | 3,286.80 |
| 7. | Electrical Wiring & Fixtures | 637.00 |
| 8. | Plumbing & Heating | 4,318.00 |
| 9. | Roofing & Sheetmetal | 5,341.00 |
| 10. | Masonry & Concrete | 82,000.00 |
| 11. | Bracing & Shoring | 8,338.32 |
| 12. | Scaffolding | 12,055.52 |
| 13. | Carpet | 1,740.00 |
| 14. | Ceramic Tile | 450.00 |
| 15. | Aluminum Windows & Doors | 2,500.00 |
| 16. | Ironwork | 1,700.00 |
| 17. | General Conditions | 12,444.00 |
| | | $ 166,177.25 |
| | Overhead | 24,926.58 |
| | | $ 191,103.83 |
| | Profit | 19,110.38 |
| | | $ 210,214.21 |

Very truly yours,

MEYERS CONSTRUCTION CO., INC.

*Michael D. Shilling*

Michael D. Shilling
President

MDS/lmd
Enclosures

EXHIBIT
5



**ST PAUL TRAVELERS**

**Stephen Brady, PCLS, FCLS**

*Claim Representative*
*Property Claim Services*

410-529-5823
866-422-8269 fax
Stephen.Brady@Travelers.com

P.O. Box 17158
Hunt Valley, MD 21297-1158

April 18, 2005

Mary V. White
22 Nicholson Street, NW
Washington D.C. 20011

RE:   Insured:                 Mary V. White
      Date of Loss:            8/17/2003
      Claim #:                 AMY4317
      Underwriting Co:         The Travelers Indemnity Company of Connecticut
      Policy Number:           432J0290

Dear Ms. White:

As you will recall we engaged as a consultant, Meyers Construction Co., Inc. to assist us in determining the value of damages in regard to the above mentioned claim. We are in receipt of Meyers Construction Co., Inc.'s report outlining the value in the amount $210,214.21.

At this time we are processing settlement of this claim based on Meyer's Construction Co., Inc.'s estimate which has been included for your review. Meyer's Construction Co., Inc. has been in direct contact with Mr. Jim Hunter of Hunter Innovations to discuss the job and numbers. We have provided Hunter Innovations with opportunity to provide the necessary back-up documentation to dispute our consultant's findings. Should we receive any further documentation from Hunter Innovations we will take it under consideration at that time.

Please refer to the enclosed Summary of Payments that pertains to your claim. The total replacement cost of damages as set forth by Meyers Construction Co., Inc. is $210,214.21. We have applied your policy deductible of $1,000.00 to that amount. Please also recall that there have been three advances issued during the course of the repairs that total $95,000.00. At this time a check in the amount of $114,214.21 has been issued and will arrive under separate cover.

EXHIBIT
6

White #AMY4317
Page 2

Please contact the undersigned with any questions that you might have.

Sincerely,

*[signature]*

Stephen Brady, PCLS, FCLS
Property Claim Representative

CC:    Hunter Innovations Company
       3310 North Vernon Street
       Alexandria, VA 22207-4468
       Attn: Mr. Jim Hunter

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


HUNTER INNOVATIONS COMPANY,              :
                                         :
                Plaintiff,               :
                                         :
v.                                       :        Case No.        1:08-cv-00671 PLF
                                         :        Judge:          Paul L. Friedman
THE TRAVELERS INDEMNITY                  :        Deck Type:      Contract
CO. OF CONN., *et al.*                   :
                                         :
                Defendants.              :


## ORDER

         UPON CONSIDERATION OF Defendants' Motion to Dismiss, plaintiff's

Opposition thereto, for the reasons stated in plaintiff's Opposition, and good cause not

having been shown, it is accordingly,

         ORDERED, that the defendants' Motion be, and is hereby, DENIED.



Date:_____

                                         _____
                                         Judge Paul L. Friedman

Copies to:

Geoffrey M. Bohn, Esq.
Robert A. Battey, Esq.
BOHN & KOURETAS, PLC
P.O. Box 17811
Arlington, VA 22216

Robert L. Ferguson, Jr., Esq.
FERGUSON, SCHETELICH & BALLEW, P.A.
100 S. Charles Street, Suite 1401
Baltimore, MD 21201-2725